To: 6152549477          From: 8657749792          10/13/2022 12:46:53 PM          P. 2 of 2

Date: 10/13/2022   12:42:05PM
User: laura

| Rule Entry Date | Case Number | Case Style | Page Number | Rule Entry | Associated Party |
|---|---|---|---|---|---|
| 09/13/2022 04:05PM | 78CC1-2022-CV-548 | Timothy Carignan (et. al) vs Travel + Leisure Co (et. al) | | Civil Summons SERVED by Davidson County Sheriff Dept - Travel + Leisure Co | |
| 09/06/2022 03:35PM | 78CC1-2022-CV-548 | Timothy Carignan (et. al) vs Travel + Leisure Co (et. al) | | Filing Entered: Contract/Debt - Filed For Timothy Carignan - Filed Against Travel + Leisure Co | |
| 09/06/2022 03:35PM | 78CC1-2022-CV-548 | Timothy Carignan (et. al) vs Travel + Leisure Co (et. al) | | Complaint for Statutory Enforcement and Relief, and for a Second Trier of Fact to Assess Punitive Damages | |
| | | | | Attorney of Record-Ryan Price | |
| | | | | Civil Summons Issued, mailed to Davidson County Sheriff Dept.-Travel + Leisure Co Advanced Cost $42 | |
| | | | | ASSIGNED TO JUDGE MOORE | |
| 09/06/2022 03:32PM | 78CC1-2022-CV-548 | Timothy Carignan (et. al) vs Travel + Leisure Co (et. al) | | Civil Case Created | |

Sworn to before me the 13th October, 2022.

_____ , Clerk

_____ , D.C.

**THE TIMESHARE LAW FIRM**
Plaintiffs Counsel, Ryan Price
Tennessee Bar No.: 039688
5800 Central Ave Pike, No. 2505
Knoxville Tn. 37912
8152589810
RyanPrice@thetimesharelawfirm.com



CIRCUIT COURT
FILED
HOUR ___ 3:32

SEP 0 6 2022

KAREN ATCHLEY, CLERK
SEVIER COUNTY, TN

## IN THE CIRCUIT COURT FOR SEVIER COUNTY, TENNESSEE

TIMOTHY and PATRICIA CARIGNAN,

                    Plaintiffs,

vs.

TRAVEL + LEISURE CO. aka
WYNDHAM WORLDWIDE
OPERATIONS, INC.,
d/b/a WYNDHAM VACATION
OWNERSHIP, INC., aka
WYNDHAM DESTINATIONS

                    Defendant.

Case No.: 22-CV-548
Dept. No.: I

## COMPLAINT

**FOR STATUTORY ENFORCEMENT AND RELIEF; AND FOR A SECONDARY TRIER OF FACT TO ASSESS PUNITIVE DAMAGES.**

## COMPLAINT

The Plaintiffs, Timothy and Patricia Carignan by and through their counsel of record, Ryan Price of THE TIMESHARE LAW FIRM, hereby alleges and complains against the Defendant TRAVEL + LEISURE CO., as follows:

## PARTIES

1.    The Plaintiffs are natural persons who have very limited resources, but are forced by extraordinary circumstances to sue a billion-dollar timeshare conglomerate that would not release them in a no-money settlement, despite full disclosure from their attorney that the

Case 3:22-cv-00362-TRM-JEM   Document 1-1   Filed 10/13/22   Page 2 of 47
PageID #: 11

timeshare contract was sold by unlawful methods detailed herein showing overt and willful violations of Tennessee law, *set forth infra.*

2.     The Plaintiffs in this matter are Timothy and Patricia Carignan.

3.     The Plaintiffs claim violations of Tennessee law regarding timeshare sales and Real Estate licensure requirements thereunder, along with other statutory violations pertaining to these timeshare sales within Sevier County, Tennessee.

4.     The Plaintiffs sue in their individual capacity, and in capacity as a spouse to the extent that any principles of Community Property law or other laws may apply to the spouse's joint assets or debts.

5.     Defendant, Travel + Leisure Co. ("Wyndham," herein) is a billion-dollar timeshare conglomerate with corporate headquarters located in Orlando, Florida at 6277 Sea Harbor Drive.

6.     Defendant has timeshare resort/hotel and sales facilities in Sevier County, Tennessee.

7.     Defendant has a Tennessee Business Identification No. 000511564, and a registered agent at 2908 Poston Ave, Nashville, TN 37203.

8.     Travel + Leisure Co. includes all of its subsidiaries and brands which are under its control as the parent company.

9.     The true names and capacities, whether individual, corporate, associate or otherwise of the Defendant are unknown to the Plaintiffs at this time, who therefore sue said Defendant by fictitious names and will ask leave of the Court to amend this Complaint to show the true names and capacities of said Defendant when the same are ascertained.

10. The Defendant is sued as principals and/or agents, servants, attorneys, and employees of said principals, and all the acts performed by them were within the course and scope of their authority.

11. Plaintiffs are informed and believe and thereupon allege that Defendant is legally responsible for the events and happenings referred to herein and has directly and proximately caused the damages and injuries to the Plaintiffs as hereinafter alleged.

12. Unless otherwise indicated, using Defendant's name in this Complaint includes its predecessor entities, d/b/a entities, affiliates, subsidiaries and agents, employees, officers, directors, principals, trustees, and representatives.

13. Travel + Leisure Co. is the parent company to all such entities and persons under its control, including all those listed in the preceding paragraphs.

## JURISDICTION AND VENUE

14. The Sevier County Circuit Court, Sevier County, Tennessee, has original jurisdiction over this matter pursuant to Tenn. Code Ann. § 16-10-101.

15. Plaintiffs purchased a Wyndham branded timeshare from Defendant.

16. Defendant sold a timeshare using contract documents that were formed and executed with the Plaintiffs herein, by and with the Defendant, within the State of Tennessee at the Defendant's sales facilities located in Sevier County.

17. Pursuant to Tenn. Code Ann. § 66-32-118, the Plaintiffs seek a determination that the contract is void for violations of the Tennessee Timeshare Act. The Plaintiffs further seek an adjudication that any of the contract's subparts (including any litigation rule or litigation

Page 3 of 44

restrictions, or any contract documents' provisions) are similarly void. Tenn. Code Ann. § 66-32-114.

18.     Plaintiffs avail themselves of Tennessee law, under which there exists no lawful basis for the Defendant to execute or collect money upon an unlawful, thus *defective* contract instrument that was signed within Sevier County, Tennessee, where upon signing, it was rendered *Voidable* under the Tennessee Timeshare Act of 1981.

19.     Plaintiffs have complied with Tenn. Code Ann. § 66-32-119 by filing this Complaint for relief within four (4) years of the timeshare purchase.

20.     Venue is proper in the Sevier County Circuit Court, located in Sevier County, Tennessee, pursuant to Tenn. Code Ann. § 20-4-104(1) because the Defendant is a non-natural person, and all of the events or actions giving rise to the cause of action occurred within Sevier County, Tennessee.

## FACTS

21.     The Plaintiffs allege the following facts.

22.     In its Tennessee timeshare facility located in Gatlinburg, Tennessee, the Defendant sells a points-based booking system for hotel rooms that are located within, and outside of, Sevier County, Tennessee.

23.     In June of 2021, Plaintiffs attended a timeshare sales presentation in Gatlinburg, Tennessee.

24.     Plaintiffs attended this presentation because they were told they would receive tickets to an event they were interested in.

Page 4 of 44

25.     Plaintiffs left their son in their hotel room, which was attached to the timeshare facility. Plaintiffs decided to let him sleep because they were told the presentation would be brief.

26.     The sales activity started at 7:00 am with a large group presentation by one sales rep to at least 30 attendees.

27.     At 8:00 am, the large group presentation ended, and the Plaintiffs were taken to meet with a second sales rep.

28.     At 8:30 am, Mrs. Carignan tried to call her son, but the sales facility had no reception. She left the presentation to check out of her hotel room and get her son.

29.     She asked several people for directions to the exit, but each time was directed back to the presentation room. The Defendant did not allow her to leave and kept trying to force her back into the presentation room.

30.     She returned to the presentation room and was told she needed to sign documents in order to leave and get her son back.

31.     Defendant offered no explanation as to what she was signing, just that she must sign it to get her son back. She signed in order to leave.

32.     When she returned to her room, she found that she was locked out of the room, and her son was locked in the room.

33.     She went to the front desk of the hotel where she was told to return to the presentation room and have her husband sign documents, only then would they release her son.

34.     During this time Mr. Carignan was still with the second sales rep. The rep continually made statements that he would be allowed to leave soon but kept making excuses as to why he could not leave.

35.     When Mrs. Carignan returned, she told her husband that their son was locked in the room until he signed documents. He signed whatever he was given in order to get his son back.

36.     After they both signed unknown documents, Wyndham unlocked the door, and they got their son back.

37.     All three of them were then taken to meet with a contract closer to finalize their timeshare sale.

38.     The contract closer appeared via zoom on a large television screen in the room. He would occasionally, briefly replace the image of his face with short sections of the contract.

39.     Plaintiffs were not given paper copies of the documents, only an electronic tablet to sign on.

40.     Plaintiffs were still in shock from having their son taken from them and felt physically ill due to Defendant's actions. Because of this, they signed anything they were told to sign.

41.     The signing process lasted 15 minutes. During that time, Plaintiffs were never given a complete copy of the contract, only a one-page summary of the amount they owed.

42.     Plaintiffs were finally permitted to leave at 2:00 pm, after they had signed all the documents they were directed to sign.

43.     Plaintiffs repeatedly asked to leave, but each time they were told they were not allowed to leave.

44.     Plaintiffs only agreed to sign because Defendant put them through a traumatic experience. They would not have signed anything if the Defendant had not taken their son.

45.     No one at the sales presentation stated they were licensed real estate agents, and no one gave the Plaintiffs written documentation concerning their real estate licensure status.

46. The only things Plaintiffs received that day was a one-page summary of what they owe and a flash drive.

47. During the presentation Plaintiffs were told that the Wyndham timeshare would be a good investment, save money on booking rooms, be easy to sell, and be available that day only (never again at the price/terms).

48. Plaintiffs were not allowed to read the contract and were not given a public offering statement.

49. Defendant did not use Tennessee licensed real estate agents for its salespeople in the Plaintiffs' timeshare transactions.

<u>**Tennessee Real Estate Licensure Requirement**</u>

50. Defendant's use of two sales reps and a contract closer—all of which did not have Tennessee real estate licenses—violated Tennessee law (Tenn. Code Ann. §66-32-102(17)) involving Real Estate licensure requirements by the Tennessee Real Estate Commission ("TREC" herein) for all Timeshare "Sales Agents". *Statutory Definitions,* Tenn. Code Ann. §66-32-102 (17); *a person who sells or offers to sell "times-hare intervals" in a "time-share program."*

51. This violation is punishable under Tenn. Code Ann. §66-32-118.

52. Defendant did not use Tennessee licensed real estate agents for at least one of the timeshare transaction roles of sales rep and closing rep (i.e., Defendant's statutory Sales Agents working directly [*directly* means in person] with the Plaintiffs) in the Plaintiffs' purchase of a timeshare at Defendant's facility in Tennessee.

53. In Fact, Defendant did not use any, <u>not one</u>, Tennessee licensed real estate agent directly working with [*directly* means in person] the Plaintiffs herein for the sales transaction to purchase a timeshare at Defendant's timeshare facility in Tennessee.

54.    Defendant's actions described in either or both of the preceding paragraphs, constituted willful noncompliance with Tennessee law cited in the Plaintiffs' First Claim.

## Public Offering Statement Noncompliance

55.    Additionally, the Tennessee Public Offering Statement ("TNPOS" or "POS" herein) requirements under Tennessee law have been willfully violated by the Defendant as shown by the Plaintiffs' Affidavits.

56.    The POS requirements under Tennessee law mandates that a timeshare entity selling a timeshare on Tennessee soil:

> **(1) Provide a TNPOS <u>before</u> the transfer of a timeshare; and,**
>
> **(2) No later than the date of any sales contract.**

57.    The TNPOS contains advisories, warnings and disclosures that are all mandated by Tennessee law to be given to prospective timeshare purchasers.

58.    Defendant failed to provide the Plaintiffs with TNPOS that complies with the requirements of statute. Defendant's POS was hidden from the Plaintiffs and was not provided until <u>after</u> all the sales transaction documents to be signed were executed (where the contracting documents indicated monies paid at the purchase, as well as future monies to be paid to the Defendant under the buyer's [Plaintiffs'] future obligations).

59.    Defendant hid the public offering statement on a flash drive containing hundreds of pages of documents. Further, the Defendant never told to the Plaintiffs what was on the flash drive. Defendant's surreptitious behavior prevented the Plaintiffs from finding the Public Offering Statement.

Page 8 of 44

60.     Defendant conducted this business within Sevier County, Tennessee directly with the Plaintiffs herein.

61.     Defendant is subject to real estate regulations and statutory claims of the State of Tennessee ("Tennessee law" herein) that apply to all timeshare sales conducted within the State of Tennessee.

62.     Wyndham sold the Plaintiffs a timeshare through its Sales Agents [all references to Sales Agents herein, shall automatically incorporate all persons under the Defendant parent company that had direct contact with the Plaintiffs in the offering and sales transaction, including any subsidiary of Defendant (or prior parent now a subsidiary) with Sales Agents directly involved with the timeshare sale that is now under the parent company.

63.     Defendant used two sales reps and a closer as Sales Agents, as defined by Tenn. Code Ann. §66-32-102 (17), in the Plaintiffs' case.

64.     All of the Sales Agents pressured the Plaintiffs to sign the contract documents (*See,* Plaintiffs' Affidavits at ¶ 25, 27).

65.     Defendant sold these timeshares to the Plaintiffs by means of *oral representations* made by its Sales Agents.

66.     Whether or not such oral representations were true, and/or were later discovered to be false, is irrelevant to proving the primary case (Plaintiffs' First Claim), which is: ***Willful Failure to use Licensed Real Estate Agents [as required by law] to conduct the sale of timeshare within the State of Tennessee.*** *See,* FIRST CLAIM FOR RELIEF.

67.     The Defendant was also noncompliant with Tennessee law, in the failure to comply with the Tennessee Public Offering Statement requirements (in particular the POS provision *before*

the transfer of the timeshare) as set forth in Tenn. Code Ann. §66-32-114. *See,* SECOND CLAIM FOR RELIEF.

68.    The TNPOS consumer advisories, warnings, and disclosures, required by Tennessee law, would have also alerted the Plaintiffs to a ***Right to Cancel*** a signed timeshare sales contract within 10 calendar days pursuant to §66-32-114.

69.    Pursuant to Tenn. Code Ann. §66-32-112(9), the Right to Cancel is required to be disclosed in the TNPOS.

70.    Furthermore, TREC rules requires that the 10-day cancellation provision be shown in bold and conspicuous type directly above where the buyer is to sign. TREC Rules 1260-06-.04.

71.    These violations are all designed by the Defendant so that the consumer does not receive the consumer advisories, warnings, and disclosures of the TNPOS before the timeshare transfer. *See,* SECOND CLAIM FOR RELIEF.

72.    *This TNPOS claim, however recalcitrantly violative and dismissive of known Tennessee law, is not necessary to prove upon a finding that Wyndham was ALREADY in violation at the sales stage per Tennessee law, where at least one, if not all, of the statutorily defined Sales Agents (Reps, and Closers) were not licensed Real Estate Agents in the State of Tennessee.* Tenn. Code Ann. §66-32-118 *See,* FIRST CLAIM FOR RELIEF.

73.    Defendant did not use Real Estate licensees to provide the TNPOS, or to answer any questions of the Plaintiffs about the contents of the TNPOS, *before* all the transaction documents were signed, and money was paid, and obligations were made for future monies to be paid (i.e., the transfer of the timeshare interest).

74. It is irrelevant to the TNPOS violations of law, as to whether or not the Defendant made *deceptive inducements* or used *bait & switch tactics*, the substance of which may have directly correlated to the TNPOS consumer advisories, warnings and disclosures, because the law applied makes noncompliance with the mandates of law: (1) Licensure Requirements; and, (2) TNPOS lawful provision, where either cause of action alone can be determinative for seeking redress. *See,* FIRST AND SECOND CLAIMS FOR RELIEF.

75. It is, however, necessary for claims of further relief, to bring open light the breadth of consumer protections afforded by the TNPOS, <u>and conversely</u>, the huge financial incentives for Defendant to systematically defy the lawful protections of consumer disclosure laws.

76. The TNPOS would have exposed certain *oral statements* during the sales process that were directly contrary to the consumer warnings mandated in Tenn. Code Ann. §66-32-112. *See,* Plaintiffs' Affidavits at ¶ 23, 25.

77. Specifically, Tenn. Code Ann. §66-32-112 requires the timeshare seller disclose: (9) that there is a 10-day cancellation period; (11) any restraints on alienation; and, (13) any fee or expected fee associated with use of the timeshare facility.

78. Defendant's willful and consistent noncompliance with the TNPOS requirement is driven by the knowledge that compliance with the statute will undoubtedly result in a massive reduction in sales.

### Multi-Hour Physical/Mental Wear-Down

79. The Plaintiffs' Affidavits shows at ¶ 19 and 21 that the sales process lasted **7 Hours.**

80. Plaintiffs anticipated a short presentation but were met with a multi-hour procedure that is designed to physically *wear down* and mentally *stress out* the consumer-attendees before signing. *See,* Plaintiffs' Affidavits at ¶ 25, 27.

81. The end result is a multi-hour prolonged sales presentation with multiple Sales Agents [here, two sales reps] telling the Plaintiffs to complete the purchase that day. *See,* Plaintiffs' Affidavits at ¶ 23, 25.

82. At the end of the presentation, a jovial contract closer met with the Plaintiffs. The closer used phrases such as, "I know you were here for many hours" and, "Let's get you out of here fast." *See,* Plaintiffs' Affidavits at ¶ 26, 28.

83. This is the crescendo moment, when the Plaintiffs were physically worn down, mentally stressed-out, and traumatized from having their son taken from them. *See,* Plaintiffs' Affidavits at ¶ 25, 27.

## The 15-Minute Closing

84. The signing of documents lasted no longer than 15 minutes. During that time, a very rapid contract signing occurred with Defendant's closing rep. *See,* Plaintiffs' Affidavits at ¶ 27 - 30, 29-32.

85. The Plaintiffs had to sign a huge volume of documents with Defendant's contract closer. *See,* Plaintiffs' Affidavits at ¶ 28, 30.

86. The contract closer controlled all the documents. *See,* Plaintiffs' Affidavits at ¶ 29, 31.

87. Plaintiffs did not freely view or read the contract documents' content, other than "brief" "glimpses" afforded to them by the contract closer. *See,* Plaintiffs' Affidavits at ¶ 29, 31.

88. The closer ensured that the Plaintiffs did not see the entirety of the contract, or even any one section of the contract for longer than a few brief seconds. *See,* Plaintiffs' Affidavits at ¶ 29, 31.

89.     Wyndham's contract closer stated to the Plaintiffs, *"this means…"* and/or *"this is what they said [or told you] about…"* followed by a rapid statement (several words or a short sentence rapidly interpreting the contents being signed). *See,* Plaintiffs' Affidavits at ¶ 30, 32.

90.     Rapid interpretations, as well as psychological trauma, were used to prevent the Plaintiffs from reading the contract and forming their own opinions on whether the terms were favorable to them.

91.     These rapid interpretations may or may not have been accurate, but that is unnecessary to prove for this cause of action.

92.     Plaintiffs did not have access to the voluminous contract pages containing a plethora of terms, conditions, limitations & restrictions, obligations (both present and future) which were actually contained in the Defendant's contract documents that the Plaintiffs signed. *See,* Plaintiffs' Affidavits at ¶ 17, 19.

93.     Some pleasantries (without any reviewing of documents) aside, the *actual* time the Plaintiffs spent signing and initialing the large volume of contract documents involved in the transfer of the timeshare was **at most 15 minutes.** *See,* Plaintiffs Affidavits' at ¶ 17, 19.

### Summation

94.     Plaintiffs allege that the Defendant's Sales Agents were <u>not Tennessee licensed Real Estate Agents</u>. *See,* Plaintiffs' Affidavits at ¶ 22, 24.

95.     Documentary proof (the absence of which is itself violative of law), was that the Sales Agents failed to make mandatory Real Estate Agency Disclosures in writing as required by Tenn. Code Ann. §62-13-405. *See,* Plaintiffs' Affidavits at ¶ 22, 24.

96.     Plaintiffs have facts which show that the Defendant <u>did not Provide the TNPOS before transferring the timeshare to the Plaintiffs.</u>

97. The timeshare interest (a points-based *use contract*) was transferred from the Defendant to the Plaintiffs by having the Plaintiffs sign all the contract documents, pay monies, and obligate themselves to pay future monies, thus transferring the timeshare.

## Licensure Requirement

98. Under Tennessee Law, Defendant's *Reps* and *Contract Closers* <u>could not do any of the following functions without a real estate license</u>. *See,* FIRST CLAIM.

> (1) perform *any* timeshare sales presentation functions;
>
> (2) review or assist in signing of *any* timeshare sales contracts; and,
>
> (3) provide, review, or assist in signing *any* POS-related documents [including the POS Receipt pursuant to Tennessee law].

## Specified Disclosures Under Tennessee Law

99. Provision and Review of the POS would have given substantial disclosure information.

100. The Tennessee statute requires the POS be given before closing so that buyers like the Plaintiffs have more to rely on than mere oral representations.

101. However, Plaintiffs were denied these consumer advisories, warnings, and disclosures. Had the Defendant's Sales Agents been properly licensed, they would have had *professional duties of conduct* as real estate licensees, and thus would be subject to:

**Regulation by the Tenn. Real Estate Commission for Deceptive Sales Practices, and thus the Defendant would have been subject to regulatory enforcement for its sales practices.**

102. Here, the Plaintiffs have endured at least four misrepresentations, using just those listed on their Affidavits at ¶ 23, 25.

103. Even if the real estate agent represented the Seller (the Defendant), that would still constitute regulatable conduct for all the real estate licensees involved with the sale of a

timeshare in Tennessee, and thus the Defendant's conduct [cited as unlawful herein] would be subject to scrutiny by Tennessee real estate regulatory enforcement.

104.    If the Plaintiffs had received the TNPOS prior, they could have discovered such TNPOS consumer advisories, warnings, and disclosures, *before* signing the sales contract documents, paying a down payment, and obligating themselves to future high-interest lien payments and perpetual annual fees.

105.    And even after a signing, the Plaintiffs could have availed themselves of a statutory right to cancel, had they known it existed within the documents.

106.    *If the Tennessee Real Estate Commission had told the Plaintiffs through the TNPOS's written documents, different information and disclosures concerning their purchase than what the Plaintiffs were told in the oral sales presentation, that would have given the Plaintiffs herein a strong reason to not sign.*

107.    Plaintiffs never received, let alone reviewed, the POS prior to signing, and thus was denied the protection of the TNPOS statutes.

108.    Defendant Wyndham has deliberately, consistently, and systematically withheld:

(1) use of licensed real estate agents in timeshare sales as required by Tennessee law; and,

(2) provision of the TNPOS. *See,* Tenn. Code Ann. § 66-32-114.

109.    Wyndham's refusal to lawfully provide the Plaintiffs the Tennessee Public Offering Statement did thereby violate the unequivocal mandates of Tenn. Code Ann. § 66-32-112, 114. *also see, Tennessee law cited herein under the* SECOND CLAIM FOR RELIEF.

110.    Defendant further abused real estate agency laws, either in practice (i.e., violation of substantive real estate agency duties/disclosures), or by using unlicensed Wyndham staff to

unlawfully perform Sales Agent functions in the offering of timeshares and sales functions. *See*, FIRST CLAIM FOR RELIEF.

111. These actions are punishable under Tenn. Code Ann. §66-32-118.

112. Wyndham has been defiant and openly hostile to Tennessee law. *Thus appropriate for Punitive Damages. See*, FIFTH CLAIM FOR RELIEF.

113. Because of the Defendant's violations of Tennessee law cited in this Complaint, Defendant has harmed the Plaintiffs **by failure to:**

    a. <u>Use Tennessee licensed Real Estate Agents</u> **as their timeshare Sales Agents; and,**

    b. <u>Provide the TNPOS prior to the Plaintiffs' contract signing</u>, **including payment and making future obligations, or have a licensee to discuss TNPOS questions.**

### Failures of Compliance with Tennessee Law

114. The presence of a TNPOS, would cause many consumers to not buy and not sign, or to at least seek legal advisement before signing.

115. Every reasonable lawyer, when presented with the contract documents, would inevitably advise clients against such a timeshare purchase with terms such as those imposed by the Defendant upon the Plaintiffs.

116. Such contract terms include substantial limitations imposed on hotel room bookings and substantially higher costs as compared to simply booking online.

117. Here, the Plaintiffs' costs were estimated at fifteen times the online cost or an estimate of **1500%** higher cost.

118. The Plaintiffs received six nights for a week's vacation annually. But after paying the monthly amount of loans and fees, Plaintiffs' costs are estimated at over fifteen times the amount

of an online booking. Plaintiffs' nightly cost is readily reached by calculating the monthly payment amount and then dividing that by the actual use-nights.

119.    A quick comparison of that mathematical figure of the timeshare's cost to book, versus booking online, would reveal that Wyndham timeshare "owners" (as the Sales Agents refer to them) end up paying far more money to book than the public (and the public does not have the same imposed booking restrictions).

120.    In most cases in the past litigation with this Defendant this costs 5 to 10 times the amount it cost to book online.

121.    Here, the Plaintiffs paid, as a Wyndham "owner," an estimate of:

**1500% higher costs than the cost to book online.**

122.    As a result, this timeshare purchase cost the Plaintiffs about fifteen times more money than what the same accommodations would cost a member of the public to book online.

123.    And the online booking consumer, unlike the Plaintiffs who were Wyndham "owners," would have been booking without obtuse booking restrictions.

124.    Timeshare owners like the Plaintiffs must book eleven (11) months in advance by using a resort-industry created booking company. There is no alternative booking method.

125.    There is highly limited availability for the bookings, contradictory to what was promised at the point-of-sale.

126.    Discrepancies such as costs, use rights, false or deceptive promises, and other inducements could have been uncovered after reading the TNPOS at the point-of-sale or anytime

within the 10-day window for Cancellation under Tennessee law, *if* the TNPOS and its Cancellation law disclosures had been presented to the Plaintiff.

127. Consumers reading the TNPOS would logically question whether they were told the truth about a range of subjects in the sales meeting, including the promised *Use Rights,* the potential *Investment Value* and/or the claimed *Resale Value. See,* Plaintiffs Affidavits' at ¶ 23, 25.

128. Potential purchasers reading the TNPOS would be alerted to inconsistencies with what they were told verbally in the sales room and closing process, and then could easily do an Internet search for subjects online compared to oral statements, such as the four misrepresentations in the Plaintiffs' Affidavits (at ¶ 23, 25) made during the sales presentation. Many consumer reporting sites contain such information, including: ***Various consumer ratings and BBB sites, ComplaintsBoard.com, RippOffReport.com, PissedConsumer.com,*** and social media websites, such as Wyndham owner/victim groups posting on ***Facebook.***

129. These consumer posting resources contain huge volumes (numbering in the tens of thousands) of dissatisfied owners of Defendant Wyndham's timeshares that have alleged they were victims of misrepresentations.

130. An inquisitive purchaser researching ***eBay.com*** and archives of its webpages for Wyndham sales offerings would have discovered a long history of undeniable data: Defendant Wyndham's timeshares are <u>not</u> selling for even $1.00.

131. This is significant, because the Plaintiffs were told by Defendant's Sales Agents that the timeshare was a "good investment" and "easy to sell." *See,* Plaintiffs' Affidavits at ¶ 23, 25.

132. Tenn. Code Ann. § 66-32-102(2) includes in the definition of "advertise" any verbal offer or general solicitation made pursuant to a timeshare sale.

133.	Many of the statements made by Defendant's Sales Agents are advertisements under the statutory definition in Tenn. Code Ann. § 66-32-102(2).

134.	Tenn. Code Ann. § 66-32-132 bans timeshare sellers from making certain statements as advertisements.

135.	Defendant's statements, in the Plaintiffs Affidavits' at ¶ 23, 25, violated Tenn. Code Ann. § 66-32-132.

136.	Tenn. Code Ann. § 66-32-132 prohibits a timeshare seller from making advertisements that are based on: (1) the availability of a resale program; (2) limited availability based on quantity or time restriction; (3) the investment merit or profit potential; (4) anticipated immediate increase in price or value of the timeshare unit; and/or, (11) misleading or deceptive representations with respect to the contents of the timeshare program.

137.	The Defendant violated each of the above cited sections during the 7-hour presentation to the Plaintiffs by claiming that the timeshare would be (Plaintiffs Affidavits' at ¶ 23, 25):

> (1) easy to sell;
> (2) was available at that price on that day only;
> (3) was a good investment; and,
> (4) would save the Plaintiffs money.

## Real Estate Licensure Compliance

138.	There is a bright-line statutory rule regarding the requirement of Real Estate Licensees performing timeshare sales in the State of Tennessee, which applies to the Defendant.

139.	This bright-line rule permits relief for the Plaintiffs from Defendant's contract under Tenn. Code Ann. § 66-32-118.

## TNPOS Provision Compliance

Page 19 of 44

140.    Had the Defendant provided the TNPOS, it would have directly contradicted many of the

*oral representations* that the Plaintiffs were told in the multi-hour sales presentation. *See,*

Plaintiffs' Affidavits at ¶ 23, 25.

141.    If the TNPOS advisories, warnings, and disclosures had been disclosed in an open light,

Plaintiffs would not have signed Defendant's contracts, as set forth below in the Plaintiffs'

Affidavits. *See,* Plaintiffs' Affidavits at ¶ 35, 37.

142.    The salient facts raised herein are seen in the following Plaintiffs' Affidavits.

## PLAINTIFFS' AFFIDAVITS

1. My name is Timothy Carignan and I declare under penalty of perjury that the foregoing is true and correct.

2. In June of 2021, I had a timeshare presentation for the sale of a Wyndham timeshare in Gatlinburg, Tennessee.

3. My wife and I attended this presentation in order to receive tickets to an event we were interested in.

4. We left our son in our hotel room, which was attached to the timeshare facility, because the presentation was supposed to be brief and he was still asleep.

5. The presentation started at 7:00 am with a large group session. There were around 30 of us attending this presentation, which was led by one sales rep.

6. At 8:00 am we were broken out from our large group into one on one sales sessions where we met with a second sales rep.

7. At 8:30 my wife tried to call our son, but the sales facility had no reception. She then left the room with the second sales rep to check out of our room and get our son.

8. After my wife left, I was still in the room with the second salesman. The salesman continually made statements that I would be allowed to leave momentarily.

9. However, he kept making excuses as to why I could not leave. Things such as, "they are just waiting for documents to print" or "we're just waiting for someone to come back from their break.

10. My wife returned later stating that Wyndham had locked our son in our hotel room and would not release him until we agreed to sign documents. She told me that she had already signed.

11. I signed whatever they put in front of me to get my son back.

12. After we both signed unknown documents, Wyndham unlocked the door, and we got our son back.

13. We were then taken to a third room where we met with a closing rep via zoom.

14. The closing rep appeared remotely on a large television in the room. On this television he would occasionally replace the image of his face with sections of the contract we were to sign. He only showed these sections for very brief moments.

15. We did not have physical copies of any documents, only an electronic tablet to sign on.

16. We were still reeling from having our son taken from us and were not thinking clearly. We signed whatever he asked us to sign.

17. The signing process took less than 15 minutes, and we were never given a complete copy of the contract before signing. Only a one page summary of what we owed.

18. We were finally permitted to leave around 2:00 pm, after we signed all the documents they told us to sign.

19. During the 7 hours we were there, we repeatedly asked to leave, and each time were told that we could not leave.

20. During the entire ordeal I felt physically ill and was shaking with anger for having to sign and buy something to get our son out of a locked room

21. This experience was traumatic, and we would not have agreed to anything if they had not used our son against us.

22. Neither the sales reps nor the closing rep said that they were licensed real estate agents, or gave us any written documentation to that effect.

23. During the presentation, we were told that the Wyndham timeshare would be a good investment, save money on booking rooms, be easy to sell, be available that day only (never again at the price/terms).

24. During the sales presentation we were <u>not</u> provided or allowed to read Wyndham's timeshare purchase transaction documents or Wyndham's disclosure documents for the Tennessee Public Offering Statement.

25. Because of sales pressure from the three Wyndham reps, and the distress of having my son taken from me, by the time we signed the contract we were physically worn down and mentally stressed out.

26. The contract closing rep seemed jovial about what he was doing. Making statements about wanting to help us finish up and get back to our vacation. He talked about how we had been there a long time and he would be fast.

27. After about 7 hours of Wyndham's timeshare sales presentation, the actual time spent signing all of the many sales transaction documents was only about 15 minutes.

28. During the 15 minutes of signing many timeshare transaction documents, we didn't review the contract contents because the documents were all controlled by Wyndham's closer using the television screen.

29. During the closing rep's review and signing procedures the closing rep appeared on a large television in the room, and he would occasionally change the view from his face to short sections of the contract. He would quickly switch back to his face so that we could not see

Page 22 of 44

the section long enough to actually read it. We could only see short sections of the contract, we could only see them for a brief period, and any section we saw was selected by the contract closer.

30. When referring to contract sections to be signed, Wyndham's closing rep gave very rapid explanations of what the contract terms were, that were a word, to a few words, or a very short sentence intended to explain the contents of the documents about to be signed. The closing rep said, "This means…" followed by a very rapid explanation of supposed contract terms, and "This is what they [the sales rep and manager] said [or told you about] …" followed by a very rapid explanation of the supposed contract terms.

31. The closing rep at the signing did not say that anything in the Contract to be signed was different from what we were told in the sales presentation.

32. The day of the Wyndham timeshare purchase described herein we were not provided a Tennessee Public Offering Statement at any time *before* the contract signing.

33. If, in the huge amount of transaction paperwork we had to sign, there was a Public Offering Statement "Receipt" stating that we were provided a Public Offering Statement we were not aware of signing such a statement at the time, and we signed many documents very rapidly that we weren't able to read, and we only followed the closing rep's instructions to sign.

34. I am certain that we were not given a Tennessee Public Offering Statement containing disclosure information for prospective timeshare purchasers, *before* we signed the contract documents, paid money, and obligated ourselves to loans and/or fees.

35. I would not have signed any documents if I had not been forced to by Wyndham's egregious behavior. They held our son in a locked room until we complied. I asked numerous times to leave, before and after getting our son back, and was told that I could not. Were it not for these actions, I never would have agreed to sign this contract. I only signed to free my son and leave.

36. Wyndham refused to let me out, and I had to seek representation from a law firm to assert our claims for deceit and duress in the sale of this Wyndham timeshare. The law firm also made requests for no-money relief, however, Wyndham has consistently rejected my attempts to free my family from this contract built on false promises, even though I was willing to give up all of our losses to just get good faith relief for my family.

Page 23 of 44

Signature: _____ Date: 8 , 19 /2022

Notarization:

Location: _____

Timothy Gipe makes his statement and affidavit upon oath and affirmation of belief and personal knowledge that the matters, facts, and statements aforementioned are true and correct to the best of his knowledge:

Dated this 19th day of August, 20 22

(Affiant's Signature)

Sworn to and subscribed before me this 19 day of Aug, 20 22.

(Seal)

OFFICIAL SEAL
MAUREEN MORRIS
Commission # 99013012
Expires August 6, 2023

(Notary's Signature)

My commission expires: 8-6-23

1. My name is Patricia Carignan and I declare under penalty of perjury that the foregoing is true and correct.

2. In June of 2021, I had a timeshare presentation for the sale of a Wyndham timeshare in Gatlinburg, Tennessee.

3. My husband and I attended this presentation in order to receive tickets to an event we were interested in.

4. We left our son in our hotel room, which was attached to the timeshare facility, because the presentation was supposed to be brief and he was still asleep.

5. The presentation started at 7:00 am with a large group session. There were around 30 of us attending this presentation, which was led by one sales rep.

6. At 8:00 am we were broken out from our large group into one on one sales sessions where we met with a second sales rep.

7. At 8:30 I tried to call my son, but the sales facility had no reception. I then tried to leave, telling the employees at the sales facility that I needed to check out of my room and get my son. However, they kept directing me back to the presentation room.

8. I asked repeatedly to leave the facility, and for directions to main entrance, but each time they guided me back to the presentation room.

9. I returned to the presentation room and was told that I needed to sign documents to leave and get my son. So I signed whatever they put in front of me in order to leave.

10. I got back to the hotel room only to find that my son was locked in the room, and I was locked out of the room.

11. I went to the front desk of the hotel and they told me to return to the sales facility and have my husband sign documents, and then they would release my son.

12. I returned to the sales facility and told my husband that our son was locked in a room until he signed whatever they asked him to sign.

13. He signed whatever they put in front of him to get our son back.

Page 25 of 44

14. After we both signed unknown documents, Wyndham unlocked the door and we got our son back.

15. We were then taken to a third room where we met with a closing rep via zoom.

16. The closing rep appeared remotely on a large television in the room. On this television he would occasionally replace the image of his face with sections of the contract we were to sign. He only showed these sections for very brief moments.

17. We did not have physical copies of any documents, only an electronic tablet to sign on.

18. We were still reeling from having our son taken from us and were not thinking clearly. We signed whatever he asked us to sign.

19. The signing process took less than 15 minutes, and we were never given a complete copy of the contract before signing. Only a one page summary of what we owed.

20. We were finally permitted to leave around 2:00 pm, after we signed all the documents they told us to sign.

21. During the 7 hours we were there, we repeatedly asked to leave, and each time were told that we could not leave.

22. During the entire ordeal I felt physically ill and was shaking with anger for having to sign and buy something to get our son out of a locked room

23. This experience was traumatic, and we would not have agreed to anything if they had not used our son against us.

24. Neither the sales reps nor the closing rep said that they were licensed real estate agents, or gave us any written documentation to that effect.

25. During the presentation, we were told that the Wyndham timeshare would be a good investment, save money on booking rooms, be easy to sell, be available that day only (never again at the price/terms).

26. During the sales presentation we were not provided or allowed to read Wyndham's timeshare purchase transaction documents or Wyndham's disclosure documents for the Tennessee Public Offering Statement.

27. Because of sales pressure from the three Wyndham reps, and the distress of having my son taken from me, by the time we signed the contract we were physically worn down and mentally stressed out.

Page 26 of 44

28. The contract closing rep seemed jovial about what he was doing. Making statements about wanting to help us finish up and get back to our vacation. He talked about how we had been there a long time and he would be fast.

29. After about 7 hours of Wyndham's timeshare sales presentation, the actual time spent signing all of the many sales transaction documents was only about 15 minutes.

30. During the 15 minutes of signing many timeshare transaction documents, we didn't review the contract contents because the documents were all controlled by Wyndham's closer using the television screen.

31. During the closing rep's review and signing procedures the closing rep appeared on a large television in the room, and he would occasionally change the view from his face to short sections of the contract. He would quickly switch back to his face so that we could not see the section long enough to actually read it. We could only see short sections of the contract, we could only see them for a brief period, and any section we saw was selected by the contract closer.

32. When referring to contract sections to be signed, Wyndham's closing rep gave very rapid explanations of what the contract terms were, that were a word, to a few words, or a very short sentence intended to explain the contents of the documents about to be signed. The closing rep said, "This means…" followed by a very rapid explanation of supposed contract terms, and "This is what they [the sales rep and manager] said [or told you about] …" followed by a very rapid explanation of the supposed contract terms.

33. The closing rep at the signing <u>did not say</u> that anything in the Contract to be signed was different from what we were told in the sales presentation.

34. The day of the Wyndham timeshare purchase described herein <u>we were not</u> provided a Tennessee Public Offering Statement at any time *before* the contract signing.

35. If, in the huge amount of transaction paperwork we had to sign, there was a Public Offering Statement "Receipt" stating that we were provided a Public Offering Statement we were not aware of signing such a statement at the time, and we signed many documents very rapidly that we weren't able to read, and we only followed the closing rep's instructions to sign.

36. I am certain that we were not given a Tennessee Public Offering Statement containing disclosure information for prospective timeshare purchasers, *before* we signed the contract documents, paid money, and obligated ourselves to loans and/or fees.

37. I would not have signed any documents if I had not been forced to by Wyndham's egregious behavior. They held our son in a locked room until we complied. I asked numerous times to leave, before and after getting our son back, and was told that I could not. Were it not for these actions, I never would have agreed to sign this contract. I only signed to free my son and leave.

38. Wyndham refused to let me out, and I had to seek representation from a law firm to assert

our claims for deceit and duress in the sale of this Wyndham timeshare. The law firm also made requests for no-money relief, however, Wyndham has consistently rejected my attempts to free my family from this contract built on false promises, even though I was willing to give up all of our losses to just get good faith relief for my family.

Signature: _____ Date: 8 / 19 /2022

Notarization:

Location: Noble, OK

Patricia McCann makes her statement and affidavit upon oath and affirmation of belief and personal knowledge that the matters, facts, and statements aforementioned are true and correct to the best of her knowledge:

Dated this 19 day of Aug , 20 22

_____
(Affiant's Signature)

Sworn to and subscribed before me this 19 day of Aug 20 22 .

(Seal)

OFFICIAL SEAL
MAUREEN MORRIS
Commission # 99013012
Expires August 6, 2023

_____
(Notary's Signature)

My commission expires: 8-6-23

### Expected Fabricated Defense

143.    The Defendant has fabricated a facade in an attempt to outmaneuver POS requirements.

144.    Defendant relies upon a TNPOS Receipt document signed by Timeshare Purchasers stating that they were provided the Tennessee Public Offering Statement documents before the contract signing and transaction consummation.

145.    However, Plaintiffs did not receive a TNPOS before signing the Defendant's contract documents and obligating themselves to future high-interest loans and rising annual fees. *See,* Plaintiffs' Affidavits at ¶ 34, 36.

146.    Defendant attempts to use the TNPOS "Receipt" requirement of TREC Rule 1260-06-.02 to circumvent the requirements of Tenn. Code Ann. § 66-32-114, making a buyer sign the POS receipt without ever showing the buyer the POS as required under Tenn. Code Ann. § 66-32-114.

### FIRST CLAIM FOR RELIEF
(Real Estate Licensee Requirement)

147.    Plaintiffs incorporate by reference all the preceding paragraphs, as though fully set forth herein.

148.    Defendant violated Tenn. Code Ann. § 66-32-102(17) by failing to use licensed real estate agents for all of its sales reps and closers

149.    Tenn. Code Ann. § 66-32-102(17) requires timeshare sellers to use licensed real estate agents as their Sales Agents.

150.    The sales reps and closer herein at the point-of-sale (i.e., Wyndham Sales Agents) involved with the Plaintiffs' timeshare transaction, are all believed to be unlicensed.

151. It cannot reasonably be assumed that Defendant's sales reps directly involved with the Plaintiffs' sales transaction were all Tennessee licensed real estate Sales Agents.

152. Similarly, it cannot reasonably be assumed that Defendant's closing rep responsible for signing all the contract documents and taking money and note obligations from the Plaintiffs was a licensed real estate agent.

153. Assuming, *arguendo*, that even if all such [statutory] Sales Agents were duly licensed, Defendant's Real Estate Licensees failed to properly uphold licensee professional conduct duties under Tenn. Code Ann. § 62-13-405.

154. Plaintiffs did not receive the TNPOS consumer advisories, warnings, and disclosures, as directed to by TREC. *See,* SECOND CLAIM FOR RELIEF.

155. Even if Defendant's Sales Agents had been *Tennessee licensed Real Estate Sales Agents*, they failed to disclose their Agency status to the Plaintiffs and comply with provision requirements of the Tennessee Public Offering Statement, *before* Plaintiffs signed and were obligated under Wyndham contract documents.

156. And even if such Wyndham Sales Agent individuals had been duly licensed real estate agents, they still had to comply with all the applicable standards for conducting business that apply to real estate licensees pursuant Tennessee law.

157. As a consequence of Defendant's: (1) deliberate defiance in the use licensed real estate agents as proscribed by Tennessee law; (2) deliberate avoidance of Tennessee consumer disclosures [the failure of TNPOS provision, *before* transferring the timeshare]; along with, (3) untruthful statements concerning material facts made to a prospective buyer (Plaintiffs herein), the Plaintiffs are entitled to relief under the claims set forth herein.

## Real Estate License Requirement

158. Tenn. Code Ann. § 66-32-102(17) explicitly requires all Sales Agents to be licensed real estate agents.

159. Failure to use licensed real estate agents is punishable under Tenn. Code Ann. § 66-32-118.

160. The purchase was made within the last four years.

161. Plaintiffs have brought his case within the 4-year statute of limitations as required under Tenn. Code Ann. § 66-32-119.

162. Tenn. Code Ann. § 66-32-118 permits relief for the Plaintiffs.

163. Defendant deliberately did not use licensed real estate agents as timeshare Sales Agents because licensees would be subject to the requirements of Tenn. Code Ann. § 62-13-101, et seq.

164. Defendant avoids using licensees because those licensees would be required to make certain transactional disclosures that would negatively impact the Defendant's profit margins.

165. If the Defendant had licensees, they would be required to disclose the agent's agency status in writing under Tenn. Code Ann. § 62-13-405.

166. Those licensees would also have the duty to disclose any known adverse facts to each party under Tenn. Code Ann. § 62-13-403.

167. If Defendant's Sales Agents were licensed and they failed to make such disclosures, they would be subject to regulatory investigations and sanctions, including losing their license. Tenn. Code Ann. § 62-13-312.

168. Such an investigation would expose the actions Defendant took against the Plaintiffs, including those actions laid out in the Plaintiffs' Affidavits.

169. Furthermore, Tenn. Code Ann. § 66-32-121(f)(2)(F) permits TREC to revoke or suspend licenses for real estate agents that make misrepresentations during a timeshare sale.

170.    Defendant avoids hiring real estate agents as Sales Agents because Defendant's policies will cause any licensee to lose their license.

171.    If Defendant's Sales Agents were licensed in compliance with Tennessee law, the licensees would have *professional duties of conduct*, and thus the Defendant would be subject to regulatory enforcement by the Tennessee Real Estate Commission for Deceptive Sales Practices.

172.    Tenn. Code Ann. § 62-13-312(b)(1) expressly prohibits a licensee from making any substantial or willful misrepresentation. The statute provides that when a licensee makes such a representation TREC has the authority to revoke or suspend their license.

## Licensee Conduct Regulated

173.    If the closer had been a Real Estate Licensee, he would have owed duties of professional conduct which are regulated by the Tennessee Real Estate Commission (TREC).

174.    The TNPOS consumer advisories, warnings, and disclosures are intended by law to be given by a licensed, competent, and regulated real estate agent.

175.    Had Defendant's agents been properly licensed, the Plaintiffs could have asked questions concerning the TNPOS contents to a person with inherent duties of professional conduct subject to consequences and penalties for the Licensee's noncompliance with such rules of conduct, which are Rules designed by TREC to prevent the very activity set out in this Complaint.

176.    And significantly, under Tennessee Real Estate Agency law, the Licensee must disclose their Agency status to the buyer (the Plaintiffs herein). Tenn. Code Ann. § 62-13-405.

177.    Here, the Sales Agents failed to make any real estate agency disclosures to the Plaintiffs because they are thought to be unlicensed. *See,* Plaintiffs' Affidavits at ¶ 22, 24.

## Relief

178.    Plaintiffs seek the return of all monies collected upon the voidable contract.

Page 32 of 44

179.    After such *primary relief*, further remedies can be ordered for credit disparagement (trade line removal) for a void, nonexistent contract, and for Punitive Damages. *See,* FIFTH CLAIM.

## SECOND CLAIM FOR RELIEF
### (Public Offering Statement Mandate)

180.    Plaintiffs incorporate by reference all the preceding paragraphs, as though fully set forth herein.

181.    Defendant failed to provide the Plaintiffs with a POS that complies with statute.

182.    Tenn. Code Ann. § 66-32-114 requires timeshare sellers to provide a POS on the day of the sale.

183.    However, the Defendant hid the POS given to the Plaintiffs to prevent them from ever discovering it. Defendant was successful as the Plaintiffs never found their POS.


### **The Contracting Process**

184.    During the 7-hour sales presentation, the sales reps assured the Plaintiffs about various features and benefits. However, it is not necessary to prove whether any of these *oral representations* were later proved to be untruthful, or that TNPOS warnings would have caused the Plaintiffs to not purchase, or to later cancel under Tennessee law.

185.    The entire contract signing process was artfully controlled by the closer. The closer prevented the Plaintiffs from reading the contract by limiting what sections of the contract the Plaintiffs could see, and for how long they could see them. Of the substantial amount of timeshare contract documents, the Plaintiffs were only permitted to see selected sections [by the closer], and only for short periods of time. *See,* Plaintiffs' Affidavits at ¶ 29, 31.

186.    The closer filtered the contract contents and provided his own interpretations of the contents. Plaintiffs, worn down by the hours of the sales process and trauma of having their son

taken from them, signed, paid a down payment, and obligated themselves to tens of thousands of dollars in the form of a loan.

187. However, the TNPOS would have directly contradicted many of the *oral representations* that the couple was told in the 7 hours of sales-related activity.

## REMEDIES

188. Plaintiffs' prior two claims for relief would seek an ending to the contract obtained by unlawful means, and for monetary relief to reimburse monies paid on a contract adjudged to be unlawful, and further for punitive relief, as justice so requires:

### Recission and Restitution

(a) to put the parties in their pre-contract position as if the contract never occurred;

(b) rescission ends the contract, and thereby the subparts, including its venue clause, any limitations or waivers to a jury trial or punitive damages, and any TNPOS Receipt;

### Termination and Unjust Enrichment

(a) under the Unjust Enrichment standard, the Plaintiffs are entitled to all monies paid on a defective contract, upon which the Plaintiffs did justifiably rely to their detriment;

(b) return of monies paid is easy to calculate by simply adding all of the monies paid by the Plaintiffs: down payment(s), loan payments and fees paid;

### Further Relief

(a) component to these matters, the Court may have a second trier of fact phase for assessing Punitive Damages applicable under Tennessee law. *See,* FIFTH CLAIM;

(b) The second trier of fact shall assess the amount of damages needed in order to deter Defendant's future actions in violation of Tennessee law. *See,* FIFTH CLAIM.

## THIRD CLAIM FOR RELIEF
### (FRAUD)

189. Plaintiffs incorporate by reference all the preceding paragraphs, as though fully set forth herein.

190. All elements of fraud are met, and the Plaintiffs are entitled to relief as a result.

Page 34 of 44

191. Fraudulent misrepresentation has six elements. Those elements are: 1) the Defendant made a representation of an existing or past fact; 2) the representation was false when made; 3) the representation was in regard to a material fact; 4) the false representation was made either knowingly or without belief in its truth or recklessly; 5) Plaintiffs reasonably relied on the misrepresented material fact; 6) Plaintiffs suffered damage as a result of the misrepresentation.

### Four Misrepresentations

192. Here, the defendant made at least four representations that were false when made. Those four statements are listed in the Plaintiffs' Affidavits at paragraphs 23, 25.

193. The first representation, that the timeshare would be a good investment is false because this timeshare, and timeshares in general are not good investments.

194. Generally, a good investment is something that provides a return on upfront cost. Either by reducing the amount of money spent over a longer period, or by turning a profit.

195. Timeshares, and this timeshare specifically, do neither. This timeshare costs more money than booking online or in person, and it comes with restrictions that booking online or in person do not have. Similarly, it will never turn a profit due to the high interest loans and ever-increasing maintenance fees charged by the resort.

196. The increased cost, extra restrictions, and inflating fees render the timeshare a drain on resources with no investment merit.

197. The second representation, that the timeshare would save money is false because timeshares in no way save the purchaser money on booking vacations.

198. Here, the timeshare costs the Plaintiffs **1500%** more than booking online or in person.

199. Because this timeshare increases the amount of money required to book rooms (which is already fifteen times the online or in person cost) by yearly raising points requirement, this timeshare does the opposite of save money.

200. The third representation, that the timeshare is easy to sell is false because timeshares are not easy to sell; they are nearly impossible to sell.

201. Timeshares are less than worthless, especially in resale. The Defendant's timeshares are not selling at any price because there they are a liability rather than an asset.

202. As previously stated in paragraph 130 herein, Defendant's timeshares are not selling for $1 on eBay.

203. The fourth representation, that the timeshare was available that day only, is false because the timeshare was not available at the price and terms on that day only.

204. The timeshare sales rep and manager here made misrepresentations in order to make a sale. They stated that they have limited quantities, and offering a lower price, when there was no limit to the quantity they could sell, and they did not offer a lower price.

205. Their statements that the Plaintiffs must buy today because the price would never be available again was false.

### The Misrepresentations are Material

206. All four of the misrepresented facts were material.

207. Each misrepresentation was material because each was a reason for the Plaintiffs to sign.

208. Plaintiffs made their purchase because they thought it would be beneficial to them, that it would be a good investment, save money, be easy to sell, etc.

209. The Plaintiffs would have been less likely to purchase the timeshare had they been aware that these statements were false.

210. Because each misrepresentation was a factor related to the Plaintiffs' reason for purchasing, each misrepresentation is material.

### Each Representation was Knowingly False when Made

211. The Defendant knew that each misrepresentation was false when made.

212. Firstly, the Defendant knew each statement was false because each statement is banned by statute.

213. The Tennessee Legislature has seen fit to ban these statements because in timeshare sales transactions these statements are so often false when made.

214. Furthermore, even without the ban the Defendant still knew that these statements were false.

### Good Investment

215. Firstly, Defendant knew that its timeshares, and this timeshare specifically, are not a good investment because it knows there is no potential for them to reduce the amount of money spent or return a profit.

216. Defendant knows this because it knows that it will subject purchasers to high interest loans and increasing maintenance fees. These fees and costs prevent the timeshare from ever reducing the amount of money spent by the purchaser. Defendant designs these fees to prevent the purchaser from ever getting any investment merit from the purchase.

217. Here, the amount of money spent by the purchaser on booking rooms prevents the timeshare from ever being a good investment.

### Save Money

218. Defendant also knew that its timeshares would not save money because it knows that it is cheaper to book rooms online or in person.

219. Defendant knows how much it charges online or in person to book a room per night. Defendant also knows how much it charges for its timeshares.

220. Because Defendant knows both of these, it knows that timeshares are more expensive than booking a room online or in person.

### Easy to Sell

221. The Defendant knew that the timeshare would not be easy to sell because it knows that timeshares similar to this one, on eBay and elsewhere, have no resale value.

222. Because this timeshare lacked resale value, and the Defendant knows this, it knows that this timeshare would not be easy to resell.

### Available That Day Only

223. Defendant knew that the timeshare was not limited by time or quantity such that it would be available that day only.

224. Defendant knew that its statements that there was a limited quantity of timeshares, and that it was offering a deal were false because there is no such limitation as to how many points it can sell.

225. Therefore, the Defendant knew that there was no limit by time or quantity.

226. Because Defendant knew that there was no limit by time or quantity, it knew that the timeshare was not available that day only.

### **Plaintiffs' Reliance was Reasonable**

227. Plaintiffs' reliance on the misrepresentations was reasonable under the circumstances given that they had just been subjected to a 7-hour procedure designed to induce a state of compliance in the potential purchaser.

228. Further, the Defendant prevented the Plaintiffs from reading the contract before signing as stated in the Plaintiffs' affidavits at paragraphs 29, 31.

229. Because Defendant only gave the Plaintiffs oral misrepresentations to rely on, and because the Defendant took extensive action to put them in a vulnerable mindset, the Plaintiffs' reliance was reasonable.

## Damages

230. Plaintiffs have suffered damages in the form of a down payment, loan payments, and maintenance fees. Further, the Plaintiffs have suffered damages in the form of attorney's fees.

## Fraudulent Inducement

231. Fraudulent inducement has one additional element to those listed above: that the Defendant's misrepresentations were intended to induce reliance on the statement.

232. Here, that additional element is met because the misrepresentations were sales pitches designed to get the Plaintiffs to sign and purchase.

233. Further, the Defendant induced reliance on the statements by preventing the Plaintiffs from reading the contract. The only information available to the Plaintiffs was the Defendant's oral misrepresentations.

234. Therefore, the Defendant attempted to induce reliance on its misrepresentations and did so by obtaining the Plaintiffs' signatures. Thus, the additional element is met.

## Fraudulent Concealment

235. Fraudulent concealment has three elements. 1) the Defendant had knowledge of a material fact; 2) the Defendant had a duty to disclose that fact, but did not, and; 3) the Plaintiffs suffered harm as a result.

## Defendant Concealed its Contract

236.    Here, the Defendant had knowledge of its contract, but intentionally failed to provide it to the Plaintiffs.

237.    Defendant failed to provide its contract to the Plaintiffs as stated in the Plaintiffs' Affidavits at paragraphs 17, 19.

238.    As the Defendant was the only one with access to the contract, it had a duty to disclose it.

239.    Defendant had knowledge of its contract, and its staff had a duty to disclose that contract but failed to do so, and the Plaintiffs have suffered harm as a result.

240.    The Plaintiffs have been harmed because the Defendant's contract was significantly different than they had been led to believe. The Plaintiffs have suffered harm in the amount of their down payment on the contract, loan payments, and maintenance fees.

### Defendant Concealed its Public Offering Statement

241.    Similarly, the Defendant had knowledge of its public offering statement.

242.    As set out previously in paragraphs 58 and 59 herein, the Defendant failed to properly provide a public offering statement.

243.    Defendant has a duty to disclose its public offering statement under Tenn. Code Ann. § 66-32-114.

244.    The Plaintiffs were harmed by this failure as they were not given the disclosures mandated by the Tennessee legislature. This has led to economic harm in the form of a down payment, loan payments, and maintenance fees.

### Defendant Withheld Licensed Real Estate Agents and their Disclosures

245.    Defendant had knowledge that it failed to use licensed real estate agents as its sales reps.

246.    Defendant further knows that it failed to provide disclosures and warning that these sales reps would have provided.

247. Defendant had a duty to use licensed real estate agents under Tenn. Code Ann. § 66-32-102(17).

248. The Tennessee Legislature implemented this requirement in the Tennessee Timeshare Act to ensure that purchasers received disclosures from those with duties to provide them.

249. Defendant has acted in a manner to prevent the Plaintiffs from receiving the disclosures intended to be received. For example, a licensed real estate agent would have the duty to tell the purchaser that many things in the contract were different from the sales presentation, and that the timeshare was not a good investment.

250. Defendant harmed Plaintiffs by failing to make these disclosures through licensed real estate agents. Without the benefit of those disclosures, Plaintiffs did not know that the sales reps had made numerous misrepresentations.

251. Plaintiffs suffered financial harm in the amount of their down payment, loan payments, and maintenance fees.

## FOURTH CLAIM FOR RELIEF
(Duress)

252. Plaintiffs incorporate by reference all the preceding paragraphs, as though fully set forth herein.

253. The Plaintiffs signed the contract under duress, and therefore the contract should be held void.

254. Duress is present when there is a: condition of mind produced by the improper external pressure or influence that practically destroys the free agency of a party and causes them to do an act or make a contract not of their own volition, but under such wrongful external pressure. When determining whether a party experienced duress, a court should consider the age, sex,

intelligence, experience, and force of will of the party, the nature of the act, and all the attendant facts and circumstances.

255. Here, there has been improper external pressure from Defendant Wyndham when it locked Plaintiffs' son in a hotel room.

256. Defendant purposefully prevented the Plaintiffs from getting their son out of the room in order to put pressure on them and make them more likely to sign documents.

257. Once Defendant had applied this pressure, it put unknown documents in front of them and told them to sign to get their son back.

258. Plaintiffs would have done anything to get their son back.

259. They did not sign of their own free will, but because they had to sign to get their son out of a locked room. Plaintiffs did not act of their own volition, but only acted to free their son.

260. After giving the Plaintiffs their son back, Defendant continued to use the trauma it had inflicted, as well as its position of power to force the Plaintiffs to sign even more unknown documents.

261. Defendant used Plaintiffs' son as leverage to force the Plaintiffs to sign. Defendant destroyed the Plaintiffs' free will, they only agreed to sign the many contract documents that day in order to get their son back.

262. Defendant's action was of an extreme nature. There are very few actions Defendant could have taken that were more extreme than locking a child in a room for hours until his parents agreed to pay tens of thousands of dollars.

263. Plaintiffs' son was locked in a room until the Plaintiffs agreed to sign anything the Defendant put in front of them.

264. Because the Plaintiffs were stripped of their free will by the Defendant and its actions and did not sign the contract of their own free will, the Court should find the contract void for duress.

## FIFTH CLAIM FOR RELIEF
(Bifurcated Trial - Second Trier of Fact)

265. Plaintiffs incorporate by reference all the preceding paragraphs, as though fully set forth herein.

266. There is a second phase for a second trier of fact on the matter of punitive damages.

267. The second trier of fact shall assess the amount of damages needed in order to deter Defendant's future actions in violation of Tennessee law. Plaintiffs request the maximum amount of punitive damages allowable pursuant to Tenn. Code Ann. § 29-39-104(a)(5).

268. Plaintiffs are entitled to relief because Defendant's unlawful acts have conferred a benefit upon itself.

269. Defendant has and is appreciating the benefit.

270. Defendant accepted and retained the benefit of monies paid by the Plaintiffs under circumstances where it would be inequitable for Defendant to retain the benefit without the payment of value for the same.

271. Defendant willfully violated several sections of the Tennessee Timeshare Act of 1981, specifically Tenn. Code Ann. § 66-32-102(17) and 114.

272. As a direct and proximate cause of the Defendant's actions, Plaintiffs have been damaged in an amount to be proved at trial and are entitled to relief under Tenn. Code Ann. § 66-32-118.

273. Defendant's conduct was malicious, oppressive, and committed with a reckless disregard to the rights of the Plaintiffs, and in direct opposition to the laws of Tennessee. This warrants punitive damages under Tenn. Code Ann. § 66-32-118.

Page 43 of 44

274.    After such a ruling, with no substantive questions of law to apply as to whether there is

liability, the second trier of fact phase, either by Judge or Jury, would have one task: to assess the

punitive damages needed in order to deter future unlawful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief against Defendant as follows:

1.  For judgment in favor of the Plaintiffs and against Defendant,

2.  For rescission of the agreements and restitution,

3.  Alternatively, for contract termination returning all monies (Unjust Enrichment),

4.  For punitive damages,

5.  For prejudgment interest,

6.  For attorney's fees and costs incurred herein,

7.  For credit disparagement removal by trade line removal,

8.  And for such other and further relief as the Court deems just and proper.

DATED this 6th day of September, 2022.

Respectfully Submitted,

**THE TIMESHARE LAW FIRM**
Plaintiffs Counsel, Ryan Price
Tennessee Bar No.: 039688
5800 Central Ave Pike, No. 2505
Knoxville Tn. 37912
8152589810
RyanPrice@thetimesharelawfirm.com

| | | |
|---|---|---|
| **Sevier County**<br>Circuit Court<br>Sevierville, Tennessee | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 1 | **Case Number**<br>22-CV-548<br>I |

**Timothy and Patricia Carignan**     Vs.     Travel + Leisure Co.

Served On:

Travel + Leisure Co.     2908 Poston Ave, Nashville, TN 37203

C/O Corporation Service Company

*Mailed to Davidson County Sheriff*

You are hereby summoned to defend a civil action filed against you in _____ Circuit _____ Court, _____ Sevier _____ County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _September 6, 2022_      _Crystal Sutton D.C._
                                                   Clerk / Deputy Clerk

Attorney for Plaintiff:     **Ryan Price**

---

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to     **Rita D. Ellison** , Circuit Court Clerk,   **Sevier** County
           125 Court Avenue, Room 204E, Sevierville, TN 37862

---

### CERTIFICATION (IF APPLICABLE)

I,   **Rita D. Ellison** ,   **Circuit Court** Clerk of   **Sevier** County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

                            Clerk / Deputy Clerk

---

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date: _____      By: _____
                                         Please Print; Officer, Title

Agency Address _____      Signature _____

---

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____ , I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____ . On _____ I received the return receipt, which had been signed by _____ on _____ . The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

                            Notary Public / Deputy Clerk (Comm. Expires      )

Signature of Plaintiff _____      Plaintiff's Attorney (or Person Authorized to Serve Process)
                                             **(Attach return receipt on back)**

*ADA: If you need assistance or accommodations because of a disability, please call _____ , ADA Coordinator, at ( ) _____*

*Rev. 03/11*

| Sevier County<br>Circuit Court<br>Sevierville, Tennessee | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 1 | Case Number<br>22- CV -548<br>I |
|---|---|---|

| Timothy and Patricia Carignan | Vs. | Travel + Leisure Co. |
|---|---|---|

Served On:

RECEIVED

Travel + Leisure Co.    2908 Poston Ave, Nashville, TN 37203

SEP 21 2022

C/O Corporation Service Company

You are hereby summoned to defend a civil action filed against you in ____Circuit____ Court, ____Sevier____ County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: _September 6, 2022_

_Crystal Sutton D.C._
Clerk / Deputy Clerk

Attorney for Plaintiff: **Ryan Price**

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to   __Rita D. Ellison__, __Circuit Court__ Clerk, __Sevier__ County
__125 Court Avenue, Room 204E, Sevierville, TN 37862__

Out of County
Rec'd Date 9/12/22
D.S.

### CERTIFICATION (IF APPLICABLE)

I, __Rita D. Ellison__, __Circuit Court__ Clerk of __Sevier__ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____

Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

**Served**

I certify that I have served this summons together with the complaint as follows: **Corporation Service Company**

Date: SEP 13 2022

**Sheree Thomas**
By: _____
Please Print: Officer/Davidson County Sheriff's Office
P.O. Box 196383 Nashville, TN. 37219-6383

Agency Address              Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

Notary Public / Deputy Clerk (Comm. Expires _____ )

Signature of Plaintiff          Plaintiff's Attorney (or Person Authorized to Serve Process)
**(Attach return receipt on back)**

_ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____

_Rev. 03/11_